UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BRIAN DUNNIGAN<br><br>Plaintiff,<br><br>v.<br><br>YORK COUNTY, WILLIAM KING, in his official capacity, ERIC DAIGNEAULT, DONOVAN CRAM, and MATTHEW ROCCHIO<br><br>Defendants | CASE NO: 2:19-cv- |

COMPLAINT (JURY TRIAL REQUESTED)

NOW COMES Plaintiff Brian Dunnigan and complains as follows:

INTRODUCTION

1. On February 16, 2018, Plaintiff Brian Dunnigan was arrested for disorderly conduct after a dispute arose at That Place, a restaurant and bar in Ogunquit, Maine. The Ogunquit Police Department transported Brian to York County Jail, in Alfred, Maine, where he was booked and placed in a cell. Throughout Brian's arrest and booking, Brian informed jail personnel that he had multiple medical issues that required immediate attention. As a diabetic, he needed insulin and his shoulder—on which he recently had surgery—was injured during his arrest. York County Jail correctional officers ignored Brian's request during booking. They placed him in a cell alone.

2. Confined in his cell, Brian continued to demand medical attention—at times more aggressively. But instead of insulin, York County correctional officers, fed up with Brian's banter and continued requests, decided to provide him with a different form of treatment. Corporal Eric Daigneault, a supervisor at York County Jail, entered Brian's cell—where Brian stood alone, a threat to no one—with a Taser X26 Conducted Electrical Weapon ("CEW") and proceeded to

1

torture Brian, shocking his chest with the Taser for almost a minute while his fellow correctional officers pinned Brian to the ground.

3. York County Jail released Brian the next day. The misdemeanor charges against him were ultimately dismissed, but the injuries sustained that evening will haunt Brian for the rest of his life. Cpl. Daigneault, in egregiously violating Brian's constitutional rights under the United States and Maine constitutions, left Brian with at least three broken ribs, permanent scars on his chest from the Taser burns that became infected, and forever traumatized by his torture on the concrete floor of a York County Jail cell.

## PARTIES

4. Plaintiff Brian Dunnigan resides in Wells, Maine.

5. York County is a Maine political subdivision responsible for operating of the York County Jail.

6. Defendant Sheriff William King is the York County Sheriff. Sheriff King has final decision-making authority over York County Jail policies and procedures. He is a party to this suit only in his official capacity.

7. Corporal Eric Daigneault is a correctional officer employed by York County. He was the shift supervisor in charge of York County Jail while Brian was in custody.

8. Officer Donovan Cram is a correctional officer employed by York County.

9. Officer Matthew Rocchio is a correctional officer employed by York County.

## JURISDICTION

10. Because this action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution, federal-question

jurisdiction is appropriate under 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over Brian's state law claims pursuant to 28 U.S.C. § 1367.

## GENERAL ALLEGATIONS

11.     At approximately 9:30 pm on February 16, 2018, Brian was arrested by the Ogunquit Police Department at That Place, an Ogunquit restaurant and bar.  A dispute arose between Brian and another That Place patron.  Brian was asked to leave but refused.  Ultimately, the Ogunquit police arrived and charged Brian with disorderly conduct and other misdemeanors.

12.     Ogunquit police officer Michael Faia transported Brian to the York County Jail at 1 Layman Way, Alfred.

13.     When Brian arrived at York County Jail, Cpl. Eric Daigneault was the intake supervisor on duty.

14.     Brian is an insulin-dependent diabetic.  During processing at the Jail, he informed correctional officers and a nurse of his condition, and that he required medication. He explained that he could die if his diabetes was left untreated. Although the nurse checked Brian's blood sugar level, which was high, neither she nor any correctional officers did anything to address Brian's medical needs.

15.     Brian asked the officers to call his wife, Sharon, so that she could deliver his required medications.  Sharon, similarly, called York County Jail to explain to correctional officers that Brian needed access to insulin.  Brian's request and Sharon's phone call were both ignored.

16.     After processing, Brian was escorted to Cell 2131 by Cpl. Daigneault and Officer Cram.  The escorting officers placed Brian on his bunk and instructed him to stay put until they exited the cell.  Brian complied.

17. Without his medication, Brian's discomfort continued to escalate. Alone in his cell, he tried to get the attention of correctional officers—repeatedly requesting medical assistance.

18. Despite his requests, however, Brian remained alone in Cell 2131. He did not pose a physical threat to correctional officers, other inmates, or himself.

19. At some point, Cpl. Daigneault became fed up with Brian. According to the Corporal's report, he entered Brian's cell alone on the premise of "calming" Brian down so that he could sign the summons issued by the Ogunquit police department. When Daigneault entered Cell 2131, Brian again demanded his medication and swore at the officer. Daigneault exited Brian's cell and slammed the door shut. Brian was again alone in his cell.

20. Immediately after exiting Cell 2131, Cpl. Daigneault prepared his Taser X26, yelled for an officer to reopen Brian's cell door, entered the cell, and instructed his subordinate officers to restrain Brian on the concrete floor. While at least two other officers immobilized Brian, Daigneault rammed his Taser into Brian's chest and pulled the trigger.

21. Law enforcement frequently describe CEWs like the Taser X26 as a less-than-lethal method of subduing suspects in the field or controlling detainees in a jail setting. Launched in 2003, the X26 is Taser's most popular model.[1] Because of the frequency with which it causes cardiac arrest, however, Taser no longer markets the X26 and recently developed a newer model which deploys a substantially lower electric current through the body.

22. Like all Taser products, the X26 can be used in either "probe" or "drive-stun" mode. Probe mode allows the Taser-wielding officer to shoot a target at a range of approximately fifteen feet. The Taser's barbed-probes attach to the human body on contact, and the Taser—which remains connected to the probes by lightweight wires—administers bursts of high-voltage

---

[1] Taser manufacturer Taser International, Inc. now operates as Axon Enterprise, Inc. ("Axon").

electricity. Because probe mode fires two barbed metal darts that diverge in flight and enter the body at different points, the electrical current flowing in between the probes results in neuromuscular incapacitation.

23. Drive-stun mode, on the other hand, allows the Taser user to deploy the device as a contact weapon. In addition to the projectile probes, the Taser X26 has two metal prods affixed to the front of the weapon that release bursts of electricity when the CEW itself connects with the human body. Unlike probe mode, drive-stun mode does not rely on the electrical current flowing through the body between the Taser's two barbed probes to incapacitate by debilitating the neuromuscular system. Instead, dry-stun mode simply inflicts an unbearable pain burning the subject into submission with what is essentially a supercharged cattle prod.



(Fig. 1 – Taser X26 in drive-stun mode)

24. When Daigneault entered Cell 2131 after arming his Taser, his intention was plainly to punish Brian for his perceived non-compliance. Brian, in his cell alone, did not pose a threat of

physical harm to anyone. There was no need—or plan on Cpl. Daigneault's behalf—to transport Brian from his cell to another location. There was no safety issue within Brian's cell that required a correctional officer to enter. Leaving Brian's cell door shut was a vastly superior choice if the aim was to protect jail personnel safety—a choice that would have been consistent with York County Jail's policies and procedures and that would have negated Cpl. Daigneault's asserted need to use near-deadly force on Brian.

25. When he Tased Brian, Cpl. Daigneault did not seek to incapacitate him using the Taser in "probe" mode.[2] With Brian restrained by at least two other officers, Daigneault straddled Brian—his knees on Brian's chest—and raked the weapon across Brian's chest for almost one minute.

26. Cpl. Daigneault pressed the Taser into Brian's chest with such force that the pressure broke three ribs and the electrical burns left permanent scarring. Daigneault and other officers report that Brian continued to resist—and therefore deserved additional drive-stun deployments. But Brian, who by that time had defecated on himself and was restrained by at least two other correctional officers, was convulsing involuntarily as Daigneault made the decision to continually rake the Taser across Brian's chest.

27. As Brian convulsed on the floor with his head bouncing off the concrete over and over again, Daigneault triggered the Taser repeatedly—seven dry-stun deployments lasting, on

---

[2] Cpl. Daigneault claimed in his report that he fired his Taser in probe mode and that Brian deflected the Taser barbs with his t-shirt. This statement, however, is entirely inconsistent with Daigneault's own report and the very physics of Taser deployment. When fired, a Taser X 26 releases a burst of at least 24 confetti tags alongside its probes that are marked with serial numbers and stick to the target and surrounding area. There is no indication that these tags were present on Brian or in his cell after Cpl. Daigneault tased him. More importantly, the Taser X 26 fires its probes—two large metal darts—at a rate of 165 feet per second. Successfully deflecting the probes with a t-shirt at close range would be impossible—especially because Brian had already removed his shirt at the time Cpl. Daignaeault entered Cell 2131 to deploy his Taser.

one occasion, as long as thirteen seconds. Each time Daigneault pulled the trigger, he screamed at Brian "are you going to do what we say now."

28. The picture below was taken one day after Brian was released from York County Jail on February 18, 2018—



(Fig. 2 – Brian Dunnigan Taser burns)

29. After torturing and severely injuring Brian, Cpl. Daigneault and other correctional staff failed to administer any medical care. This was a direct failure to follow York Country Jail protocol, which mandates medical assessment after any Taser deployment. Without treatment, the open burn wounds on Brian's chest were exposed to the filthy conditions in Cell 2131 and later became dangerously infected, requiring additional and otherwise unnecessary surgery on his shoulder.

30. The next day, February 17, 2018, the York County Jail released Brian to his wife. Sharon brought Brian home to stabilize him with his medications and rest. Once home, however,

Brian experienced intolerable pain. On February 18, Sharon brought him to the emergency room where he was diagnosed with, and treated for, at least three fractured ribs.

31.     When Brian's pain continued unabated for many days he returned to the hospital, presenting with a fever and severe discomfort in his shoulder. At the time of his arrest, Brian was recovering from surgery on his right shoulder. The Taser injuries caused severe inflammation and, because of Defendants' failure to administer medical care, infection in his shoulder. At the advice of his doctors, Brian underwent a second surgery to insert a Picc line into his arm to treat his infected shoulder with intravenous antibiotics.

32.     After spending the night in the hospital, Brian was discharged home where, for the following forty-three days, he was home-bound and forced to remain almost immobile while the antibiotics were administered.

33.     Since his February 2018 torture in York County Jail, Brian has experienced on-going pain and suffering; short-term memory issues; headaches; loss of motion in his shoulder; severe back discomfort; weight loss; increased complications to his pre-existing diabetes, Rheumatoid Arthritis, colitis, and other injuries.

34.     Beyond his physical injuries, Brian continues to experience severe mental and emotional distress and has developed post-traumatic stress disorder as a result of his prolonged torture on the floor of Cell 2131.

### COUNT I – 42 U.S.C. § 1983, 5 M.R.S. § 4682
### (Cpl. Daigneault)

35.     Brian repeats and realleges every other paragraph in this Complaint.

36.     At all relevant times, Brian was a pre-trial detainee protected from the use of excessive force by the Fourth and Fourteenth Amendments of the United States Constitution and Sections 5 and 6-A of the Maine Constitution.

37. By raking his Taser across Brian's chest for almost a minute, Cpl. Daigneault intentionally used unnecessary and excessive force in violation of the United States and Maine constitutions.

38. Daigneault's use of force was excessive because he used his Taser on a pre-trial detainee charged with misdemeanors, who was contained safely in his cell. Prior to deploying his Taser, Daigneault failed to take any reasonable steps to warn or allow Brian to comply with his commands—because the corporal had no legitimate operational goal in entering Brian's cell. Similarly—and to the extent that Brian was causing a disturbance with his repeated requests for medical treatment—Daigneault made no attempt to diffuse the situation. Instead, he aggravated and escalated matters by opening Brian's cell and instructing fellow correctional officers to pin Brian to the ground.

39. Daigneault's use of force was excessive because he deployed his Taser to intentionally punish Brian. He did not enter Brian's cell for any legitimate or lawful purpose—i.e., to extract Brian, to stop him from escaping, to protect jail personnel or other inmates, or even to maintain order—his only objective was punitive. Had the operational goal been to extract Brian from his cell, Cpl. Daigneault could have achieved that means through a lesser use of force,[3] and by following procedure. When Daigneault initially deployed his Taser, moreover, Brian was already restrained by at least two other correctional officers.

40. York County Jail procedure for extracting a combative inmate involves a team of five correctional officers, protective gear, and a video camera. Daigneault ignored all of these procedures because his goal was not to extract Brian, but to torture him. After shocking Brian

---

[3] Daigneault reports that he Tased Brian because Brian became combative when he entered Cell 2131. Brian's Taser burns, however, are not consistent with a combative inmate who attacked or attempted to evade attack by moving around his cell. His burns are confined to his upper chest because Cpl. Daigneault repeatedly applied his Taser while pinning Brian to the cell floor and crushing his body with such force that he broke three ribs.

9

with his Taser, Daigneault did not "extract" him to another location. He left him in Cell 2131 with three broken ribs, second degree burns, and covered in his own fecal matter.

41. Daigneault's use of force was excessive because he deployed his Taser an excessive number of times. Beyond having no legitimate operational goal, Cpl. Daigneault deployed his Taser seven times and for over forty-five seconds—a disproportionate number of high-voltage shocks under any circumstances because the only possible outcome of such excessive exposure is severe pain, torture, and a high risk of cardiac arrest.  Before each additional use of force, moreover, Daigneault made no effort to determine whether additional taser deployments were required.

42. If he had used his Taser in a reasonable manner, Daigneault would have paused between each Taser deployment to examine Brian's physical state, whether he had the ability to comply, or whether he was still conscious.  Instead, the Taser log demonstrates that Daigneault hesitated for literally one second between each burst—breaking only long enough to allow the Taser to reset.  (Ex. A.)

43. WHEREFORE, Plaintiff Brian Dunnigan respectfully requests that the Court enter Judgment against Defendant Eric Daigneault on Count I and award him actual and punitive damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

COUNT II – 42 U.S.C. § 1983, 5 M.R.S. § 4682 Municipal Liability<br>(York County and Sheriff King, Official Capacity)

44. Brian repeats and realleges every other paragraph in this Complaint.

45. Both York County Jail's policies and procedures regarding the use of the Taser and its Taser training program fail to protect inmates from constitutional violations.  Without adequate

training or policies, York County failed inform its correctional officers of the risks and dangers of excessively long and repeated Taser deployments and targeting vulnerable body areas.

46. In arming its correctional officers with Tasers, York County has a duty to develop appropriate policies and properly train its officers in a manner that would avoid excessive force. York County was also required by Axon to re-certify its Taser users annually and update its policies, which it failed to do.

47. In failing to adopt proper Taser policies and annually recertify all Taser end-users, including Cpl. Diagneault, with up-to-date Taser training protocols, York County recklessly disregarded or willfully ignored widely available guidance from Axon, leading law enforcement organizations, and other authorities, regarding the use of Tasers to enforce compliance.

48. For over a decade, Axon has recognized the risks of repeatedly drive-stunning as a method of achieving compliance. The extreme localized pain caused by drive stunning does not incapacitate large muscle groups but instead causes a subject—consciously or unconsciously—to attempt to escape the pain. Without the ability to incapacitate, repeated drive-stun deployments create a vicious cycle where a subject's involuntary spasms and thrashing can be perceived by untrained law enforcement as additional resistance requiring, of course, further Taser deployments.

49. The risks of untrained officers overusing Tasers are well documented.[4] For this reason, many correctional facilities do not arm staff with these weapons. Notably, the Federal Bureau of Prisons does not issue Tasers to its correctional staff because of the risks of abuse and excessive force. In 2011, two leading law enforcement organizations—Police Executive Research Forum and the U.S. Department of Justice, Office of Community Oriented

---

[4] The dangers of allowing untrained correctional officers to use CEWs are well documented. *See* Jeong Suh, *Shock Tactics*: *Part 6 The Prisoners*, REUTERS (October 1, 2019, 12:49 PM), https://www.reuters.com/investigates/special-report/usa-taser-jails/.

Policing Services—issued guidelines to law enforcement and correctional facilities suggesting that training should stress that cumulative shocks of more than 15 seconds in drive stun mode may increase risks of injury or death, and officers should avoid resorting to Tasers for "pain compliance"—forcing people to obey orders. The organizations' guidelines further warn that such uses "may have limited effectiveness, and, when used repeatedly, may even exacerbate the situation by inducing rage in the subject."

50. Guidance from the Police Executive Research Forum and the U.S. Department of Justice, Office of Community Oriented Policing Services, also instruct law enforcement that drive-stunning is likely to increase resistance, rather than achieve compliance.

51. Recognizing these risks, Axon's policies, training materials, and information bulletins to law enforcement—since at least 2009—have warned about the dangers of repeatedly Tasing, especially drive stunning, to achieve compliance, and that using a Taser solely for pain compliance is unconstitutional. For example, the following bullet points were displayed as early as 2011 in Axon's re-certification training demonstration and related materials—

- Multiple CEW applications cannot be justified solely on grounds that a suspect fails to comply with a command;

- Any decision to administer multiple CEW applications must take into account whether a suspect is capable of complying with the officer's commands;

- Minimize the number and duration of [Taser] exposures. Most human [Taser] lab testing has not exceeded 15 seconds, and none has exceeded 45 seconds.

52. In 2008, Taser issued a bulletin to correctional and law enforcement agencies using its weapons warning that the chest was no longer considered a desirable target area and should be avoided along with the face, neck, and groin.

53. Taser's best practices for use-of-force templates and training manuals are widely available and are adopted by most agencies that use Tasers as their official policy and procedure related to the use of that weapon. Axon's training materials and bulletins are distributed annually as part of Axon's certification and re-certification program. Taser recommends that all end-users recertify annually to ensure up-to-date training and knowledge.

54. York County had knowledge, or at least constructive knowledge, of the risks of repeated or excessive Taser exposure. Despite this widely-available information—and Taser's recommendation that all Taser users recertify annually—York County does little to inform correctional officers of the risks of repeated and excessive Taser deployment. When it revised its use-of-force policy in 2017, York County failed to include known and widely-available information about repeated CEW exposure into its Taser policy or training materials; or recertify its Taser end-users on an annual basis.

55. York County's Taser use-of-force policy, containing its CEW policy, is attached as Exhibit B. Although its CEW policy requires annual re-certification, materials produced in response to a request for information show that Cpl. Daigneault was only recertified once since his initial certification in 2008. Upon information and belief, no further training or re-certification of Daigneault was conducted.

56. More importantly, York County's use-of-force policy and training did not provide any instruction that a Taser—in either mode—can actually increase resistance, that an officer should not Taser a prisoner multiple times solely because a target fails to comply with a command, that officers should consider whether a prisoner is able to comply before administering multiple Taser deployments, that each Taser deployment constitutes additional force, or that a Taser should only be used in situations where officer safety is at risk.

57. Cpl. Daignault's excessive force was a direct result of York County's failure to train and adopt proper Taser use policies. York County failed to train or adopt a policy limiting Taser use to situations involving officer safety. The omissions and erroneous information in York County's policies and training procedure regarding repeated and prolonged Taser use led directly to Brian's torture at the hands of five of its correctional officers. Officer Daignaeult—in compliance with York County taser policy, but in violation of Brian's constitutional rights—Tased Brian in a situation where he did not pose a threat to any officer or inmate, or to his own safety. Brian simply failed to comply with Cpl. Daigneault's order to stop talking, and he continued to request medical attention. The York County correctional officers, moreover, deployed the Taser for almost one minute without stopping—an act not prohibited by the York County Taser policy, but akin to torture.

58. Similarly—and despite explicit guidance from Taser and a common understanding in the law enforcement and medical community that deploying a Taser to the chest can result in excessive pain and an unnecessary risk of cardiac arrest—York County Jail failed to modify their Taser use policy for over ten years to reflect widely-known risks of shocking a target in the chest. On the contrary, York County includes the chest as a desired target—secondary to the back. As a result, Cpl. Daigneault—without proper training or guidance—repeatedly targeted Brian's chest with his Taser.

59. Had York County properly trained Cpl. Daigneault, a York County supervisor, he would not have deployed his Taser at all; or he would have deployed the weapon once—avoiding excessive and unnecessary use of force.

60. WHEREFORE, Plaintiff Brian Dunnigan respectfully requests that the Court enter Judgment against Defendants York County and Sheriff William King in his official capacity on

Count II and award him actual and punitive damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

COUNT III – 42 U.S.C. § 1983, 5 M.R.S. § 4682 Failure to Intervene<br>(Officer Cram, Officer Rocchio)

61. Brian repeats and realleges every other paragraph in this Complaint.

62. Officer Cram and Officer Rocchio were present in Cell 2131 when Cpl. Daigneault repeatedly tortured Brian with his Taser X 26.

63. At all times, these officers had a reasonable opportunity to intervene by taking action to stop Daigneault from Tasering Brian repeatedly or by refusing his order to pin Brian to the ground.

64. Instead of intervening to prevent Brian's torture, however, these officers acquiesced and participated by restraining Brian for almost a minute while Daigneault raked the Taser across his chest.

65. WHEREFORE, Plaintiff Brian Dunnigan respectfully requests that the Court enter Judgment against Defendants Cram and Rocchio on Count III and award him actual and punitive damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

Dated October 4, 2019 at Portland, Maine.

*/s/ Benjamin N. Donahue* _____
Thomas F. Hallett
Benjamin N. Donahue
*Attorneys for Plaintiff*
HALLETT WHIPPLE WEYRENS
6 City Center, Suite 208
P.O. Box 7508
Portland, Maine 04112-7508
Tel: 207-775-4255
bdonahue@hww.law