**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

BRIAN DUNNIGAN,                          )
                                         )
               Plaintiff,       )
                                         )
v.                                       )   Docket no. 2:19-cv-00450-GZS
                                         )
YORK COUNTY, et al.,                     )
                                         )
               Defendants.     )
                                         )

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are two motions for summary judgment: (1) Motion for Summary Judgment filed by Defendants York County and William King (together, "York County") (ECF No. 104); and (2) Motion for Summary Judgment filed by Defendant Donovan Cram (ECF No. 106).[1] Having considered the Motions and the related filings, the Court GRANTS the Motion filed by York County and King (ECF No. 104) and DENIES the Motion filed by Cram (ECF No. 106).

## I.    LEGAL STANDARD

A party is entitled to summary judgment if it appears, based on the record before the Court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party, and a fact is 'material' if it has the potential of affecting the outcome of the case." Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up). The party moving for summary judgment

---

[1] The Motion for Summary Judgment filed by Defendant Cram was initially joined by Co-Defendant Matthew Rocchio. See ECF No. 106, PageID # 3110. Thereafter, the Court granted Plaintiff's unopposed motion to dismiss the Complaint against Defendant Rocchio. See ECF No. 123. As a result, this Motion is currently before the Court as to Defendant Cram only.

must demonstrate an absence of evidence that supports the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (cleaned up); see Fed. R. Civ. P. 56(e). "That evidence, however, cannot 'rely on improbable inferences, conclusory allegations, or rank speculation.'" Snell v. Neville, 998 F.3d 474, 486 (1st Cir. 2021) (alterations in original omitted) (quoting Enica v. Principi, 544 F.3d 328, 336 (1st Cir. 2008)). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Hum. Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (cleaned up). "When determining if a genuine dispute of material fact exists, [courts] look to all of the record materials on file, including the pleadings, depositions, and affidavits without evaluating the credibility of witnesses or weighing the evidence." Taite, 999 F.3d at 93 (cleaned up).

District of Maine Local Rule 56 prescribes a detailed process by which the parties are to present to the Court the "material facts . . . as to which the moving party contends there is no genuine issue." D. Me. Loc. R. 56(b). This local rule requires each statement of material fact to be "followed by a citation to the specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56(f). A party opposing a motion for summary judgment must then file an opposing statement in which it admits, denies, or qualifies the moving party's statements, with

citations to supporting evidence, and in which it may set forth additional facts, again with citations to supporting evidence.  See D. Me. Loc. R. 56(c).  Ultimately, in constructing the narrative of undisputed facts for purposes of summary judgment, the Court deems any statement with a supporting record citation admitted but "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment."  D. Me. Loc. R. 56(f).

In the section that follows, the Court provides the factual narrative in accordance with this standard, drawing on the statements of material fact submitted by York County (ECF No. 105) and Cram (ECF No. 107), the responsive statements filed by Plaintiff (ECF Nos. 119 & 121), and the moving Defendants' replies to Plaintiff's additional statements of material fact (ECF No. 125 & 127).[2]

## II.      BACKGROUND

### A.       Arrest and Custody of Dunnigan

On February 16, 2018, Ogunquit Police officers arrested Plaintiff Brian Dunnigan for disorderly conduct, resisting arrest, and criminal mischief.  (ECF No. 119, PageID # 3350.)  Dunnigan was taken to the York County Jail (the "Jail") and held overnight.  (ECF No. 121, PageID # 3378.)  Eric Daigneault, Donovan Cram, and Matthew Rocchio were amongst the corrections officers on duty at the Jail when Dunnigan was brought in.  (ECF No. 119, PageID #s 3350-51.)

Upon Dunnigan's arrival, an Ogunquit Police officer removed Dunnigan's handcuffs, and York County corrections officers escorted him into the booking area of the Jail.  (Dunnigan Dep.

---

[2] With respect to any fact that is not admitted in these documents, the Court has reviewed and cited to underlying exhibits that are included in the summary judgment record (ECF Nos. 91-102, 111-17).  In several instances, Defendants have lodged various evidentiary objections to Plaintiff's statements of material facts.  See ECF No. 125, PageID #s 3422-24, 3428-3431; ECF No. 127, PageID #s 3449-50.  To the extent that the Court does not address each of these objections individually, the Court has reviewed all of the cited exhibits and has disregarded any statement of fact that is not properly supported by admissible evidence in the record currently before the Court, as it is obliged to do.  See D. Me. Loc. R. 56(f).

(ECF No. 92), PageID #s 1000-01.)  While in that area, Daigneault asked Dunnigan a question and also made a derogatory comment regarding Dunnigan's level of intoxication and his status as a resident of Massachusetts.  (Id., PageID #s 1003, 1006.)  Dunnigan responded, "let me exercise my First Amendment Right and go F yourself."  (Id., PageID #s 1003-04.)  As part of the Jail's intake procedure, Dunnigan removed one of two shirts he wore and provided it to Daigneault.  (Id., PageID # 1019; ECF No. 119, PageID #s 3351-52.)[3]  Daigneault, Cram, and another officer then began to walk Dunnigan to a cell.  (ECF No. 119, PageID # 3352.)  As the officers walked to the cell, Dunnigan stumbled and fell to the floor, causing the officers to fall as well.[4]  (Dunnigan Dep., PageID #s 1015-16.)  Believing Dunnigan to be purposefully resisting, they handcuffed and walked him the rest of the way to the cell.  (ECF No. 119, PageID # 3352.)

After Dunnigan was placed in a cell, he informed the corrections officers that he was a "Type 2 diabetic insulin dependent" and asked to "go to the hospital because [he] didn't feel good." (Dunnigan Dep., PageID # 1020.)  A "medical person on staff" arrived within minutes and measured his blood sugar.  (Id., PageID #s 1020-22.)  Dunnigan's blood sugar measured at 220, whereas his "target range is anywhere from 70 to 120."  (Id., PageID # 1023.)  Shortly after, he "yelled through the [cell] door" and reiterated his request to go to the hospital, which was rebuffed.

---

[3] The parties dispute whether Dunnigan threw his shirt at Daigneault or simply handed it to him.  See ECF No. 119, PageID # 3351.  Defendant Cram alleges that, because Dunnigan "threw [his] shirt at [] Daigneault and was being aggressive or uncooperative, the officers moved [ ] Dunnigan to" a cell.  ECF No. 107, PageID # 3124.  Dunnigan denies that he threw his shirt but neither denies nor explicitly admits that he was aggressive or uncooperative.  See ECF No. 119, PageID #s 3351-52; see also Dunnigan Dep., PageID # 1019.  Camera footage of the intake area is unclear as to this exchange between Dunnigan and the officers.  See Video "Intake, 2018-02-17 03-52-00-060" at 5:35-5:45.  Thus, the Court acknowledges a genuine factual dispute as to these details.  However, the Court concludes these intake details are, at best, marginally relevant to resolution of the pending summary judgment motions.

[4] The Court acknowledges that Cram alleges that, as the officers walked Plaintiff to the cell, he intentionally "veered off to the side and then he braced his legs and became 'dead weight,' causing everyone to fall to the ground."  Cram Reply (ECF No. 126), PageID # 3443.  However, the Court construes the facts in the light most favorable to Plaintiff's own testimony (Dunnigan Dep., PageID # 1016), as it is required to do so in resolving Defendants' Motions.

(Id., PageID # 1028.)  He then took off his t-shirt and wrapped it around his neck and the bracket attaching his cell's bed to the wall in a "suicidal gesture," prompting officers to remove him from his cell.  (ECF No. 121, PageID # 3378; Dunnigan Dep., PageID # 1029.)  After unsuccessfully trying to buckle Dunnigan into a restraint chair outside the cell, the officers – one of whom was Daigneault – told him to return to his cell.  (ECF No. 121, PageID # 3379; Dunnigan Dep., PageID # 1029.)  Dunnigan walked back to his cell, mumbling to Daigneault "either what a moron or what an asshole."  (Dunnigan Dep., PageID # 1039; see ECF No. 121, PageID # 3379.)  While the cell door initially closed, Daigneault then asked Cram to open the door to Dunnigan's cell, which Cram did from a touch screen.  (ECF No. 119, PageID # 3352.)

Dunnigan, who was in his cell with his back turned, heard the cell door close and open again.  (Dunnigan Dep., PageID # 1042.)  Daigneault came into the cell and charged at Dunnigan (who had raised his hands in the air), tackled him to the ground, and knelt on his chest.  (Id., PageID #s 1106-08; ECF No. 121, PageID # 3379.)[5]  While still kneeling on Dunnigan, Daigneault withdrew a taser with no cartridge in it and, without any warning to Dunnigan, began repeatedly deploying the taser in drive-stun mode to Dunnigan's bare chest.  (Dunnigan Dep., PageID # 1030; ECF No. 121, PageID #s 3379-80, 3403; ECF No. 125, PageID # 3429.)[6]  Daigneault tased Dunnigan for a minute during this incident.  (Dunnigan Dep., PageID # 1030.)[7]  According to the

---

[5] It is unclear whether Dunnigan had his back to the wall or cell door when Daigneault entered the cell.  See Dunnigan Dep., PageID # 1029 ("I had my back to the wall . . . ."); id., PageID # 1038 ("[M]y back was facing the jail cell door.").

[6] Daigneault maintains that he paused in between each trigger pull.  See ECF No. 125, PageID # 3429; Daigneault Dep. (ECF No. 96), PageID #s 2567, 2606.

[7] To the extent that Defendant Cram questions Dunnigan's credibility with respect to the duration of the tasing, the Court notes that it may not evaluate "the credibility of witnesses or weigh[] the evidence" when resolving Defendants' Motions.  Taite, 999 F.3d at 93.  The Court also concludes that a factfinder could resolve any factual dispute as to the length of the tasing in Plaintiff's favor.  Additionally, the summary judgment record does not include any evidence reflecting a genuine dispute that this tasing incident lasted significantly less than a minute.  See ECF No. 127, PageID #s 3450-51.

taser report for Daigneault's taser use that day, he deployed the taser trigger seven times over the course of less than one minute shortly after 11 PM.  (Lichten Dep. (ECF No. 93), PageID # 1274; Lichten Dep. Ex. 20 (ECF No. 93-1), PageID # 1647.)

At some point, two other officers came into the cell to assist Daigneault.  (ECF No. 119, PageID # 3353; Dunnigan Dep., PageID # 1030.)  Arriving first, Cram observed Daigneault and Dunnigan on the floor with Daigneault already deploying his taser.  (ECF No. 119, PageID # 3353.)[8]  With Dunnigan laying supine on the cement floor faceup, Cram held his left arm and eventually another officer held his right arm.  (ECF No. 121, PageID # 3379; ECF No. 119, PageID #s 3353-54.)  Responding to a call for assistance from Cram, Rocchio entered the cell and found Daigneault and Cram trying to restrain Dunnigan on the floor.  (ECF No. 119, PageID # 3355.)[9] Rocchio assisted Cram in handcuffing Dunnigan.  (Id.)  The taser was not activated during the time Rocchio was in the cell.  (Id.)[10]

During the incident, Dunnigan repeatedly complained that he could not breathe and defecated himself.  (ECF No. 121, PageID # 3379.)  As a result of this altercation, he suffered four broken ribs

---

[8] "When Cram first entered the cell it appeared to him that [] Daigneault was trying to get [Plaintiff] under control or to restrain him" and "was already using [a] taser on [Plaintiff]'s chest."  ECF No. 119, PageID # 3353.  About ten seconds after entering the cell, Cram called for assistance on his radio.  Id., PageID # 3354.

[9] At some point during the altercation, Cram attempted to restrain Plaintiff in handcuffs because he "was flipping his arms."  ECF No. 119, PageID # 3353.  Cram "did not tell [] Daigneault to stop using the taser" and does not know how many times Daigneault tasered Plaintiff.  Id., PageID # 3354.

[10] This incident was also observed from outside the cell by the Ogunquit Police officer who arrested Plaintiff.  This officer heard the taser being deployed and observed Dunnigan "actively resisting" the officers who had entered the cell.  See ECF No. 100, PageID #s 2864-68, 2885-86; see also ECF No. 119, PageID # 3356.

as well as several burn marks to his chest.  (Id., #s 3379-80.)  Dunnigan "does not have a clear memory of any events that occurred after the taser applied."  (ECF No. 119, PageID # 3355.)[11]

### B.    The Jail's Use-Of-Force Policies and Practices

Under the York County Sheriff's Office "Standard Operating Procedure" for the use of force (the "Use of Force Procedure"), a corrections officer's use of force against an inmate "is restricted to situations where the use of physical force is necessary to" protect the officer or "others from assault or threat of assault," "[p]revent the destruction of County property," or "[p]rotect the inmate from harm."  (Lichten Dep. Ex. 11 (ECF No. 93-1), PageID # 1588.)  The appropriate "degree of control [] depends on what the [c]orrections [o]fficer[] perceives as reasonable and necessary under the circumstances."  (Id.)[12]  Moreover, "[j]ail personnel [must] use only the amount of force necessary" and "use physical force only as a last resort and only after a fair warning, when practical."  (Id., PageID # 1590.)  Following a use of force, and before going off duty, corrections officers must make an entry in the "Daily Jail Logs" and submit to the Captain of Operations "a written Incident Report and Use of [Force] Report" providing a description of the incident, justification of the physical force and type used, any resulting impairment or injury, any other immediate action taken (such as medical attention), and an explanation of any special equipment used.  (Id., PageID #s 1590-91.)  These reports must be "reviewed by the Director of Professional Standards" and then "forwarded to the Jail Administrator for final review."  (Id., PageID # 1591.)

---

[11] Additionally, Dunnigan's "belief as to what [] Cram . . . did with regard to [the] taser incident is derived from officer reports of the incident."  ECF No. 119, PageID # 3356.  Dunnigan cannot describe what Cram looks like and had "no contact" with Cram "either before or after the incident."  Id., PageID # 3355.

[12] Similarly, according to Plaintiff's expert witness, Richard Lichten, an officer should use the "least amount of force that is reasonably necessary to attain their lawful objectives," such as "tak[ing] the suspect into safe custody."  ECF No. 121, PageID #s 3394-95.

York County first started using tasers in its jails in 2014 or 2015. (ECF No. 121, PageID # 3389.) "Tasers are inherently dangerous weapons" that can "cause death or serious injury." (ECF No. 121, PageID # 3405; see ECF No. 125, PageID # 3431.) The Jail is responsible for ensuring its correctional officers are properly trained and is required to "follow its own policy on [t]aser training." (Chauvette Dep. (ECF No. 95), PageID #s 2469-70; see ECF No. 121, PageID #s 3395-96.) The York County Sheriff's Office "Standard Operating Procedure" for the use of "electronic control device[s]" (the "Taser Procedure") "govern[s] the use of control and [] limitations" of tasers in the Jail. (Lichten Dep. Ex. 12 (ECF No. 93-1), PageID # 1595.) "Only correctional officers who have successfully completed [the York County Sheriff's Office]'s approved training course [are] authorized to carry and use" a taser, and those authorized officers "must demonstrate competency in its use at least annually." (Id.)[13] "Taser training covers the use, safety and care of the [t]aser and constraints on its use." (Id.) The initial training consists of instruction on the use of a taser, a review of the policies and procedures regarding taser use, and taser deployment practice. (ECF No. 121, PageID # 3397; ECF No. 125, PageID # 3422.) Annual recertification training, which is required under York County policy, similarly consists of deploying the taser and briefly reviewing taser policies, including the Use of Force Procedure. (ECF No. 121, PageID #s 3389, 3397; ECF No. 125, PageID # 3422.) The recertification training, which takes three to four hours depending on the size of the class, is aimed at avoiding "some of the risks that [t]asers can create" and keeping staff updated on TASER International, Inc.'s

---

[13] According to the Taser Procedure, the York County Sheriff or designee "approve[s] which [t]aser operators have permission to deploy the device in an emergency situation." Lichten Dep. Ex. 12 (ECF No. 93-1), PageID # 1595. Since 2015, Defendant William King has been the York County Sheriff and the head of its corrections division. See ECF No. 121, PageID # 3382. For the period relevant here, King had designated Michael Vitiello, Jail Administrator from 2000 to 2021, to approve which correctional officers were authorized to use a taser. See York Cty. 30(b)(6) Dep. (ECF No. 99) ("YC Dep."), PageID #s 2820-21. Vitiello then "delegate[d] the responsibility for certifying people to use [t]asers to" TASER certified instructors and then authorized the officers who completed this training to carry and use tasers. Id., PageID # 2831.

("TASER") changes to "risk policy and assessment."  (ECF No. 121, PageID # 3397; see ECF No. 125, PageID # 3422.)  TASER's annual updates include new information and/or refreshers on previously provided information.  (ECF No. 121, PageID # 3390.)

York County's Taser Procedure instructs that "[t]he degree of control used depends on what the deputy/officer perceive[s] as reasonable with an increasing level of control to meet and overcome resistance."  (Lichten Dep. Ex. 12, PageID # 1595.)  Taser use "is restricted to instances of justifiable self-defense, protection of others, of property and prevention of escape."  (Id.)  "Upon deploying the [taser,] officers [must] energize the least number of times necessary to accomplish the[ir] operational goal."  (Id., PageID # 1597.)  As explained in the Taser Procedure, a taser "in a 'touch or drive stun' mode" is "[p]rimarily a pain compliance tool due to lack of probe spread," "[m]inimal[ly] effective compared to conventional cartridge deployments," "[m]ore likely to leave marks on the subject's skin," and "[s]ubject to the same deployment guidelines as those of cartridge deployments in a manner consistent with training."  (Lichten Dep. Ex. 12, PageID # 1598.)

Under the Taser Procedure, corrections officers who tase an inmate must submit a "Use of Force report through the chain of command . . . describing the incident substantiating the control used, date and time, and medical services rendered" before the end of their shift.  (Id., PageID # 1599.)  A "[s]upervisor" must, in turn, "[e]nsure that incidents involving the use of [a taser are] investigated and properly documented."  (Id.)  These use-of-force reports are reviewed by the Jail administrator or designee and, depending on the circumstances, then the Sheriff.  (See id., PageID #s 1595, 1599; York Cty. 30(b)(6) Dep. (ECF No. 99) ("YC Dep."), PageID # 2826.)[14]

---

[14] With respect to who ordinarily reviewed the Jail's use-of-force reports, "the [Jail's] practice was for one of the captains to review incident reports, use of force reports, and Taser reports on a regular basis."  YC Dep., PageID # 2803; see id., PageID # 2826 (explaining the "standard practice" of the Jail was for "the jail administrator or one of the captains" to review use-of-force reports involving tasers).  Before the underlying taser incident of this case, King never reviewed a use-of-force report involving a taser.  Id., PageID # 2826.

Additionally, "[d]epending on the seriousness of the injury" caused by a taser, "the Sheriff or his designee [must] notify the Attorney General's Office."  (Lichten Dep. Ex. 12, PageID # 1599.)

According to TASER's requirements, Taser "[u]ser certification is valid for a calendar year."  (Joint Exs. (ECF No. 91-9), PageID # 714; see Joint Exs. (ECF No. 91-8), PageID # 712.)  For example, individuals "certified March 11 of 2017 . . . [would] be required to recertify sometime in 2018, up to December 31 of 2018."  (Joint Exs. (ECF No. 91-9), PageID # 714.)  "However, as new User Update PowerPoint presentations, training bulletins, and product warnings are released by TASER, they must be immediately distributed to all persons authorized to use a" taser, and such "distribution is in addition to the" annual recertification requirements.  (Id.; Joint Exs. (ECF No. 91-8), PageID # 712.)  During all relevant times, the Jail did not have a policy beyond that of the Taser Procedure requiring annual taser recertification, and there was no "checklist to make sure that [t]aser users received their annual recertification."  (YC Dep., PageID #s 2804-05.)  To "ensure that [t]aser users were retrained annually," York County's "training director [who, in 2018, was Lieutenant Michael Perry] was responsible for overseeing certifications and getting people trained and not allowing people's certifications to lapse."  (Id., PageID #s 2805-06.)[15]

TASER's training and recertification materials explicitly instruct taser users that "each separate pull of the [t]aser trigger is a separate use of force and has to be independently justified" and that a taser should not be used to punish or torture an inmate.  (ECF No. 121, PageID #s 3395-

---

[15] According to David Chauvette, one of the Jail's certified Taser instructors, it is "best practice" for an officer who did not undergo recertification training "for a number of years" to again undergo initial certification training, rather than "just take a recertification course."  Chauvette Dep. (ECF No. 95), PageID #s 2474-75, 2486.  However, TASER does not require an officer in such circumstance to repeat initial certification.  Id., PageID # 2486.

96.)[16]  The "Annual [Taser] User Update" PowerPoint presentations for 2017 and 2018 explicitly

instruct taser users to "not use repeated [taser] drive stuns if compliance is not achieved."  (ECF

No. 112-3, PageID # 3305 (dated 3/1/17); see ECF No. 112-2, PageID # 3268 (dated 1/15/18).)[17]

Similarly, the 2016 "Annual [Taser] User Update" presentation instructs users to "[a]void multiple,

repeated, prolonged, extended, or continuous [taser] exposures unless necessary to counter

reasonably perceived threat(s) and it is justifiable." (ECF No. 112-1, PageID # 3194.)[18]  The 2016,

2017, and 2018 Updates also remind users to, when reasonable: "[u]se the minimum force

necessary to accomplish lawful objectives," "[u]se force only on those 'actively resisting' or

---

[16] Plaintiff's expert witness, Lichten, also opined that each taser pull is a separate use of force that must be justified.  See ECF No. 121, PageID # 3394; see also Lichten Dep., PageID #s 1236-37; ECF No. 112-1, PageID # 3191.

[17] York County objects to this statement on the basis of hearsay and also denies that the 2017 and 2018 recertification materials instruct users to avoid repeated taser applications in drive stun mode.  See ECF No. 121, PageID # 3402; ECF No. 125, PageID # 3428.  Neither the objection nor the denial is well founded.  As to the hearsay objection, the Court finds based on the record presented that the exhibits in question are admissible business records used by York County.  See Chauvette Dep., PageID # 2488.  As to the denial, the training materials in question speak for themselves, and the Court notes that the cited Chauvette testimony similarly suggests that York County has a practice of training officers to limit repeated taser deployments and to pause between deployments "to give the subject an opportunity to comply."  Id., PageID #s 2477-78.

[18] Plaintiff nevertheless maintains that the taser training materials in 2016 did not provide any training as to multiple drive stun applications.  See ECF No. 121, PageID #s 3390, 3392, 3402.  The Annual Taser User Update for 2016, however, repeatedly instructs users to avoid multiple drive stun applications.  See ECF No. 112-1, PageID #s 3194, 3199, 3202, 3225, 3238.  York County maintains that "[t]here were no new updates in the [t]aser training materials for 2017 or 2018 as compared to 2016" and therefore "there would have been no difference between the training that was provided in 2016 versus what would have been provided in 2017 or 2018."  ECF No. 105, PageID # 3105; see ECF No. 125, PageID # 3427.  Plaintiff denies this assertion, citing "significant differences in the Annual Recertification Requirements . . . used for training in . . . 2016, 2017, and 2018."  ECF No. 121, PageID #s 3391-92.  More specifically, the 2017 and 2018 updates included: (1) "touch stun guidelines not included in the 2016 Recertification Requirements"; and (2) a "handout study aid" instructing taser users to "avoid using [a] [taser] touch-stun except" by applying "3 or 4-point contact to complete [a] circuit or probe spread," to "'break contact' or [as a] distraction tactic when assaulted or tied up with a subject," or briefly "to attempt pain-compliance" (provided the subject is given a "reasonable time and opportunity to comply").  ECF No. 112-3, PageID # 3299 (2017); ECF No. 112-2, PageID # 3263 (2018).  Although the taser training updates for 2016, 2017, and 2018 each included instructions against the use of multiple drive stun applications, the Court acknowledges that the current record reflects some differences between the 2016 training that Daigneault received and the training materials for 2017 and 2018.

higher," "[g]ive a verbal warning before the use of force," "[g]ive subjects a reasonable opportunity to comply before force is used," and "[i]mmediately cease any force once a subject has surrendered or is captured, handcuffed, and controlled." (ECF No. 112-1, PageID #s 3189-90; see ECF No. 112-2, PageID #s 3265-67; ECF No. 112-3, PageID #s 3301-03.) Each of these Updates also instructs users to use each five-second taser cycle as a "window of opportunity" to establish control over the subject while he or she is affected. (ECF No. 112-1, PageID # 3191; see ECF No. 112-2, PageID # 3261; ECF No. 112-3, PageID # 3297.) According to David Chauvette, one of the Jail's certified taser instructors, a taser user must pause between deployments "[l]ong enough to give verbal commands" and provide the inmate an opportunity to comply – about "5, 10, [or] 15 seconds." (Chauvette Dep., PageID #s 2476-77.)[19] As such, Chauvette has trained officers to not repeatedly deploy a taser and to discontinue the user of a taser if they are not achieving compliance. (Id., PageID # 2477.)

Daniel Bean, a former full-time captain at the Jail and second in command to Vitiello,[20] annually reviewed roughly 15 or 20 use-of-force reports. (Bean Dep. (ECF No. 102), PageID # 3056.) According to Bean, an investigation into a use of force at the Jail would be followed by an investigative report, but a simple "review" into a use of force would not involve a report or any written record. (Id., PageID #s 3000-01.) "A review is more random" and less "in depth" than an "investigation," which "is typically prompted by either the sheriff or the jail administrator when they receive information that there may have been a violation of policy or some other action by a

_____

[19] Chauvette became an authorized taser user around 2007 and was certified as a taser instructor in 2013. ECF No. 121, PageID # 3389. Defendant York County designated Chauvette as its witness on the taser training and certifications provided to Daigneault and other authorized officers during the period in question. See Chauvette Dep., PageID #s 2450-51.

[20] Bean was a full-time employee from 2011 to 2021 and then became a part-time employee. See Bean Dep., PageID #s 2971-72.

staff [member] and/or inmate."  (Id., PageID # 3048.)  "[T]here was no system in place" to conduct "random reviews" or "spot checks" "for every incident every time" at the Jail.  (Id., PageID #s 3049-51.)  Rather, Bean or Timothy Kortes, another captain, would conduct "random reviews" or "spot checks" of use-of-force reports if they received information about an incident in which a staff member or inmate was injured or an "event that [the] staff was talking about."  (Id., PageID # 3049.)  If Kortes or Bean, "in conducting [the] random reviews or spot checks [] saw something that led [them] to believe that a policy might not be complied with," "an investigation or further review into that incident or . . . of other similar incidents involving that staff" could follow.  (Id., PageID # 3051.)  One purpose of the "random reviews" or "spot checks" was to ensure compliance with the Jail's use-of-force policies.  (Id., PageID #s 3050-51.)

### C.  Daigneault and Cram's Training

Daigneault has worked as a corrections officer at the Jail since 2001 and became a corporal in 2008.  (ECF No. 121, PageID # 3380.)  During his first taser training in 2008, he reviewed the Jail's policies and procedures regarding the use of tasers; he also reviewed TASER's instructions and practiced deploying a taser, as well as being tased.  (Id.)  Through training received prior to February 16, 2018, Daigneault was instructed that a corrections officer: should not use a taser on an inmate who is verbally noncompliant but not aggressive; cannot use force to punish or cause unnecessary pain; may "use[] only as much force as needed to be able to overcome resistance and secure the individual, and no more force than is necessary to accomplish that goal"; and may "only use a reasonable type and amount of force to accomplish a safety and security related goal."  (Id., PageID #s 3380-81.)  At the time of his deposition in November 2021, he did not recall undergoing training "about repeatedly deploying a [t]aser."  (Daigneault Dep. (ECF No. 96), PageID # 2567.)

Daigneault attended a recertification training course in March 2016[21] that was led by Chauvette and two other instructors.  (Joint Exs. (ECF No. 91-6), PageID # 708; Chauvette Dep., PageID #s 2486-87.)  Daigneault did not receive any taser training between 2008 and 2016 or between 2016 and 2020; his most recent taser recertification training was in 2020.  (Daigneault Dep., PageID #s 2523-24, 2547.)  It was only in 2016 and 2020, when Daigneault was recertified, that he was told he needed to undergo recertification training.  (Id., PageID # 2547.)  "He was never told he [could not] use a [t]aser because he had not been recertified."  (ECF No. 121, PageID # 3402; see ECF No. 125, PageID # 3427.)  Given Daigneault's initial training in 2008 and his recertification training in 2016, Daignneault was not properly certified to use a taser on February 16, 2018.[22]

Daigneault completed use-of-force "reports for times when he makes contact or pulls his taser out but doesn't use it," and all such "reports went to the administration."  (ECF No. 121, PageID # 3401; see ECF No. 125, PageID # 3426.)

---

[21] TASER's 2016 recertification training required that the taser user: "[r]eview the current Annual [Taser] End-User Update PowerPoint Presentation and any new Training Bulletins after its release date"; "[r]eceive and review the current TASER Law Enforcement Product Warnings"; "[r]eceive, review, sign and return the current Release form"; pass all functional tests; and "[d]eploy 2 TASER live [taser] cartridges into preferred target zones."  Joint Exs. (ECF No. 91-8), PageID # 712.

[22] The Court acknowledges a genuine factual dispute as to how long Daigneault had been out of taser certification on this critical date.  See ECF No. 125, PageID # 3391.  Relying on the significant gap between his 2008 certification and his first recertification in 2016, a factfinder viewing the record in the light most favorable to Plaintiff could conclude that Daigneault was out of certification for approximately nine years and 45 days at the time he tased Dunnigan.  See Joint Exs. (ECF No. 91-9), PageID # 714; Lichten Dep., PageID #s 1251-52 (Plaintiff's expert describing this gap as a "tremendous lack of training"); Chauvette Dep., PageID #s 2474-75 (acknowledging that an officer who did not undergo recertification training "for a number of years" would need to again undergo initial certification training and not "just take a recertification course").  Alternatively, a factfinder weighing all of the evidence might conclude that Daigneault had been "out of certification by approximately 45 or 50 days."  Chauvette Dep., PageID # 2487.  In any event, there is no dispute for purposes of summary judgment that Daigneault was noncompliant with annual recertification requirements of both TASER and York County on the date in question.

Cram underwent use-of-force training at the Jail but "has not been trained in the use of the taser and is not educated on its correct use."  (ECF No. 119, PageID # 3354; <u>see</u> Cram Dep. (ECF No. 98), PageID # 2756.)

### D. The Jail's Investigation into Daigneault's Use of Force Against Dunnigan and its Prior Taser Incidents

On February 18, 2018, Dunnigan emailed Defendant William King, the York County Sheriff, about his experience at the Jail two days prior.  (ECF No. 116-1, PageID #s 3331-33.)[23]  The following morning, King replied that he would "have [the] jail investigator initiate an investigation" and that Captain Timothy Kortes would contact Dunnigan that week.  (<u>Id.</u>, PageID # 3331.)

At that time, Kortes was a captain at the York County Sheriff's Department and "responsible for professional standards, recruitment and offender programming."  (ECF No. 121, PageID # 3384.)  At King's request, Kortes investigated Daigneault's taser use against Dunnigan at the Jail.  (<u>Id.</u>; YC Dep., PageID #s 2779-80.)  Kortes asked Dunnigan to speak with him at the Jail to provide more information regarding the incident.  (ECF No. 121, PageID #s 3384-85.)  Kortes and Dunnigan did not ultimately discuss the incident, however, because they could not agree to a mutually acceptable place for the discussion.  (<u>See</u> YC Dep., PageID #s 2780-81, 2787-88.)  Instead, "Kortes reviewed the reports of Daigneault and two other officers, spoke with the nurse and reviewed her report, reached out to the Ogunquit Police Department for their reports, and reviewed the video footage" of the incident.  (ECF No. 121, PageID # 3385.)[24]  After completing his investigation,

---

[23] King's first recollection of taser use against an inmate at the Jail was that involving Dunnigan.  <u>See</u> ECF No. 121, PageID # 3382.

[24] The Court notes that it has reviewed the video footage, comprised of numerous ASF Video Files, that the parties provided on a DVD.  <u>See</u> Joint Record (ECF No. 91), PageID # 692.  Several of those files are blank with no footage, and the limited files that are accessible consist of grainy, silent, and lagging footage that is difficult to discern.  The footage appears to depict some of the events leading to the taser incident and some of the events following, but not the taser incident itself.

Kortes did not write a report but verbally briefed Vitiello regarding his finding that Daigneault's taser use on Dunnigan was justified and appropriate under the circumstances.  (Id.)

In connection with this litigation, King reviewed all the use-of-force reports at the York County Jail on twenty-four dates between August 2012 and January 2018.  (Id., PageID # 3399; ECF No. 125, PageID # 3424.)  He determined which supervisors were on duty those dates, as they were the only staff members trained and authorized to carry and use a taser.  (ECF No. 101, PageID # 2922.)  Of those supervisors and other than Daigneault, he spoke with all who were "still currently employed with the agency" and all but one of the past supervisors.  (Id., PageID #s 2945-46.)  He confirmed with the supervisors that, for any time they deployed a taser on an inmate, they completed a use-of-force report.[25]  (Id., PageID # 2953.)  His review of all the use-of-force reports at the Jail between 2012 and 2018 revealed only four reports involving taser deployments.  (ECF No. 121, PageID # 3386.)  Two of the four reports involved Daigneault.  (Id., PageID # 3399; ECF No. 125, PageID # 3424.)

There have also been undocumented uses of a taser against an inmate at the Jail.  A former supervisor with whom King spoke, Jasmine Raleigh, told King that she had deployed the taser "two times during her career" but that she did not recall when.  (ECF No. 101, PageID #s 2957-59.)  Although Raleigh was employed by the Jail sometime between 2012 and 2018, King was unable to locate any use-of-force reports for her two taser deployments.  (Id., PageID #s 2958, 2960, 2962-65.)  Additionally, Daigneault recalled two occasions in which he used a taser on an inmate that were

---

[25] Plaintiff objects to the admission of this statement on the basis that it is hearsay.  See ECF No. 121, PageID # 3386.  "It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."  Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) (quotation marks omitted).  Defendants York County and King respond that Plaintiff's objection should be overruled because "King was testifying about his efforts to ensure that all use of force reports had been produced in discovery, and this assertion is not offered for the truth of the matter."  ECF No. 125, PageID # 3420.  Because the Court concludes that King's testimony could be admissible at trial for some limited purpose, the Court considers the statement for the purpose of resolving the pending motions.

different from the two incidents for which he submitted use-of-force reports.  (ECF No. 121, PageID # 3401; ECF No. 125, PageID # 3426.)[26]

In addition to reviewing the Jail's use-of-force reports, King also reviewed the log of taser deployments for which there was not a corresponding use-of-force report and determined that many occurred early in the shifts, in the middle of shifts if supervisors worked overtime, or during the preparation of transportation of inmates.  (See ECF No. 101, PageID #s 2933-34, 2938-39, 2950.)  He also determined that these deployments were likely done during training or spark tests, which are perfunctory tests to ensure a taser is working correctly.  (Id., PageID #s 2930-31, 2934, 2950-51.)[27]  "With respect to those activations that occurred that were not early in the shift," however, King did not investigate to determine how or why those activations occurred.  (Id., PageID # 2935.)  Between August 12, 2012 and January 14, 2018, there were six officer training dates.  (Id., PageID # 2934.)  According to the taser log, tasers were used during two of those trainings.  (Id., PageID # 2933.)

King has "no knowledge of officers using [t]asers in the [J]ail when they should not use them," including any violations of the Taser Procedure, and has never notified the Attorney General of any taser injury.[28]  (YC Dep., PageID #s 2827, 2834.)  For his part, Vitiello, who

---

[26] In the first incident, which occurred "quite a few years ago," Daigneault used a taser on an inmate that tried to assault him.  Daigneault Dep., PageID # 2527; see ECF No. 121, PageID # 3401; ECF No. 125, PageID # 3426.  In the second incident, "a few years" prior to November 2021, he deployed a taser in drive-stun mode against an individual in a cell who was "being aggressive" in an attempt "to try to get him cuffed up."  ECF No. 121, PageID # 3401; ECF No. 125, PageID # 3426.

[27] The Taser Procedure provides that "[a]t the beginning of each tour of duty[,] qualified correctional staff shall perform a functions check on the" taser, which includes "[p]erform[ing] a spark test for one second and check[ing] for rapid pulse rate while pointing towards the discharge barrel."  Lichten Dep. Ex. 12, PageID #s 1596-97.

[28] Likewise, Bean does not know if York County had ever reviewed a use-of-force report involving a taser.  See ECF No. 121, PageID # 3400; ECF No. 125, PageID # 3426; Bean Dep., PageID # 3066.  Additionally,

"[t]ypically [] did the disciplinary hearings for [J]ail employees," does not recall the Jail conducting any review or investigation of taser use on an inmate by Daigneault (other than that that involving Dunnigan).  (Id., PageID #s 2809-11.) [29]

## III.  DISCUSSION

The Complaint (ECF No. 1) asserts three counts under 42 U.S.C. § 1983 and the Maine Civil Rights Act, 5 M.R.S.A. § 4682.  Plaintiff alleges excessive force by Daigneault (Count I), failure by York County and King to properly train Daigneault (Count II),[30] and failure by Cram to intervene in Daigneault's alleged use of excessive force (Count III).  (See Compl. (ECF No. 1), PageID #s 8, 10, 15.)  Because Count One is with respect to only Daigneault, who has not filed a motion for summary judgment, the Court focuses its discussion on Counts Two and Three.

### A.  Count Two: Municipal Liability Based on Failure to Properly Train (Defendants York County and King)

Count Two of the Complaint seeks to impose municipal liability under the Maine Civil Rights Act (the "MCRA") and 42 U.S.C. § 1983.  (See Compl., PageID # 10.)  Plaintiff asserts that the Jail has failed, for over a decade, to properly train its correctional officers in the use of tasers and that such failure has resulted in "constitutional violations."  (Id.)  He further asserts that "Daigneault's excessive force was a direct result of York County's failure to train and adopt proper

_____

at Bean's deposition, counsel for York County represented that there were no Jail records of internal investigations of taser use.  See Bean Dep., PageID #s 3001-02.

[29] Vitiello also testified that he did not recall the number of taser-related reports he received from Kortes or Bean that they thought "warranted further investigation."  YC Dep., PageID # 2810.  The "only" taser-related case he could recall discussing with Kortes or Bean was that involving Plaintiff.  Id., PageID #s 2810-11.

[30] Plaintiff has sued King in his official capacity only.  See Compl., PageID #s 10, 14-15.  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  Kentucky v. Graham, 473 U.S. 159, 166 (1985).  As such, Plaintiff's official-capacity claim against King and his claims against York County are effectively the same claim.  See Belskis v. Somerset Cnty., No. 1:15-CV-00091-JAW, 2017 WL 835163, at *10 (D. Me. Mar. 2, 2017) (rec. dec., aff'd Sept. 17, 2017).

[t]aser use policies." (Id., PageID # 14.)  According to Plaintiff, "[h]ad York County properly trained [] Daigneault, . . . he would not have deployed his [t]aser at all [against Plaintiff]; or he would have deployed the weapon once—avoiding excessive and unnecessary force." (Id.)

Because "[t]he disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA," the Court focuses its analysis on whether York County is entitled to summary judgment with respect to the section 1983 claim. Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007).  Section 1983 provides a claim for vindicating substantive rights that have been conferred by the Constitution or laws of the United States and violated by persons acting under color of state law. See Graham v. Connor, 490 U.S. 386, 393-94 (1989).  "A municipality or other local government may be liable under [section 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 563 U.S. 51, 60 (2011).  However, "local governments are responsible only for 'their own illegal acts'" and "are not vicariously liable . . . for their employees' actions." Id.  "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." Id. (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978)).[31]  "But 'official municipal policy' need not be so explicit -- it also includes, inter alia, 'the acts of a government's policymaking officials and practices so persistent and widespread as to practically have the force of law.'" Baez v. Town of Brookline, Massachusetts, 44 F.4th 79, 82 (1st Cir. 2022) (cleaned up) (quoting Connick, 563 U.S. at 60-61).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official

---

[31] "This affirmative connection need not take the form of knowing sanction, but may include tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct." Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998).

government policy for purposes of § 1983." Connick, 563 U.S. at 61. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id. Under § 1983, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (alterations in original) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 410 (1997)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. (cleaned up). "A showing of simple or even heightened negligence will not suffice." Id. at 407.[32]

"Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick, 563 U.S. at 61. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. at 62; see Baez, 44 F.4th at 83 ("'[D]eliberate indifference may be inferred' if a municipality receives 'repeated complaints of civil rights violations . . . followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.'" (citation omitted)). However, it is possible "that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." Brown,

---

[32] "Although a state-of-mind issue such as the existence of deliberate indifference usually presents a jury question, a party against whom summary judgment is sought is not entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element." Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 496-97 (1st Cir. 2011) (cleaned up). "The non-moving party must present competent evidence that shows a genuine issue for trial." Id.

520 U.S. at 409 (citing <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 390 (1989)); <u>accord</u> <u>Young</u>

<u>v. City of Providence ex rel. Napolitano</u>, 404 F.3d 4, 28 (1st Cir. 2005) ("[L]iability without such

a pattern will be appropriate 'in a narrow range of circumstances,' where 'a violation of [a] federal

right[ ]' is 'a highly predictable consequence of a failure to equip law enforcement officers with

specific tools to handle recurring situations.'"  (quoting <u>Brown</u>, 520 U.S. at 409)).

Here, Plaintiff asserts that he was deprived of his right to be "protected from the use of

excessive force" under "the Fourth and Fourteenth Amendments of the United States Constitution

and Sections 5 and 6-A of the Maine Constitution."  (Compl., PageID # 8.)  "Having established

a deprivation of a constitutional right, however, [Plaintiff] still must establish that" York County

caused him to be subjected to such deprivation.  <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808,

817 (1985).  To this end, Plaintiff maintains that York County "had final policymaking authority

over jail operations" and that, "prior to February 2018, [it] had notice of [Daigneault's] repeated

illegal [t]aser deployments" and his non-compliance with taser training requirements.   (Pl.

Response to York County Mot. (ECF No. 120), PageID # 3366.)  Because "the need for training

was so obvious," Plaintiff asserts, York County "acted with deliberate indifference by continuing

to permit [] Daigneault to carry a [t]aser."  (<u>Id.</u>, PageID #s 3366-67.)  According to Plaintiff, "this

failure to train was the moving force behind the violation of [his] constitutional rights."  (<u>Id.</u>,

PageID # 3367.)

Because York County cannot be held vicariously liable for Daigneault's alleged use of

excessive force, Plaintiff must establish that York County failed to properly train its officers

regarding the use of force and that this failure amounted to deliberate indifference to his

constitutional rights.  <u>See</u> <u>Connick</u>, 563 U.S. at 61; <u>Brown</u>, 520 U.S. at 410.  This standard requires

proof that York County "disregarded a known or obvious consequence" of its alleged failure to

train.  Connick, 563 U.S. at 61 (quoting Brown, 520 U.S. at 410).  Relying on these principles, York County moves for summary judgment on Count Two on the basis that "Plaintiff has failed to demonstrate the factual predicate for holding York County liable for the alleged actions of Corporal Daigneault."  (York County Mot. (ECF No. 104), PageID # 3095.)  More specifically, York County cites a lack of evidence showing that it was "on notice of any pattern of past constitutional violations similar to those alleged in this case" or that the officer training "was deficient and likely to cause future violations of constitutional rights."  (Id., PageID # 3085.)  York County also highlights the lack of any evidence suggesting there was a direct connection between the training program and Plaintiff's injury.  (See id., PageID # 3093.)

The Court finds that the summary judgment record does not reflect a trialworthy issue as to whether York County acted with deliberate indifference.  At the time of Plaintiff's arrest, York County had in place policies governing its corrections officers' use of force generally and the use of tasers specifically.  The "York County policy regarding the use of [t]asers required initial training and annual recertification."  (ECF No. 121, PageID # 3389.)  Only those officers who successfully completed York County's approved training course were authorized to carry and use a taser.  The Taser Procedure provided, inter alia, that officers may use only "the least number of" taser trigger pulls "necessary to accomplish the[ir] operational goal" and that the use of a taser in "touch or drive stun" mode "is . . . [p]rimarily a pain compliance tool due to lack of probe spread," "[m]inimal[ly] effective compared to conventional cartridge deployments," "[m]ore likely to leave marks on the subject's skin," and "[s]ubject to the same deployment guidelines as those of cartridge deployments in a manner consistent with training."  (Lichten Dep. Ex. 12, PageID #s 1591, 1598.)  Additionally, the Jail's taser recertification training materials in 2016, 2017, and 2018 instructed taser users to avoid multiple, repeated, prolonged, extended, or continuous taser exposures unless

necessary and justified under the circumstances.  (See ECF No. 112-1, PageID # 3194; ECF No. 112-2, PageID #s 3263, 3268; ECF No. 112-3, PageID #s 3209, 3305.)  As further detailed in the Background section, the summary judgment record reflects that York County's training program advised against the use of repeated taser applications on an inmate, and Daigneault – at least in his recertification training in 2016 – would have been instructed accordingly.

Additionally, there is no genuine dispute that King was unaware of any pattern of incidents involving improper taser use on an inmate by a corrections officer prior to February 16, 2018.[33] The record indicates that York County was able to locate only four use-of-force reports involving tasers between 2012 and 2018 and that two of those incidents involved Daigneault.  (ECF No. 121, PageID #s 3386, 3399.)  Viewing the record in the light most favorable to Plaintiff, there may have been at least four additional (undocumented) uses of force between 2012 and 2018 by another corrections officer.  (ECF No. 101, PageID #s 2957-59, 2962-65; ECF No. 121, PageID # 3401; ECF No. 125, PageID # 3426.)[34]  However, there is no indication that these incidents involved improper uses of force, let alone violations of York County policies or the constitutional rights of its detainees.  "Consequently, no pattern of violations existed to put the County on notice that its training program was deficient in this regard."  Barney v. Pulsipher, 143 F.3d 1299, 1308 (10th Cir. 1998); see Camilo-Robles v. Zapata, 175 F.3d 41, 46 (1st Cir. 1999) ("[T]he extent of a

---

[33] Similarly, Vitiello, the Jail administrator, could not recall any review or investigation of taser use on an inmate by Daigneault.  See YC Dep., PageID #s 2809-11.  Likewise, Bean testified that, although Daigneault's use-of-force reports for two particular incidents would have prompted him to seek further information about those incidents, he had no reason to believe that Daigneault's performance with respect to taser use was "problematic."  See Bean Dep., PageID #s 3054-55, 3057-59.

[34] Plaintiff asserts that "Daigneault has likely used a [t]aser on inmates at [the Jail] on 7 or more occasions" and that "[a]t a minimum Sheriff King should have located 10 (and likely more) [t]aser use of force forms between 2012 – 2018, four or more by Daigneault."  ECF No. 121, PageID # 3401.  As Defendants York County and King note, however, these statements are not supported by the record.  See ECF No. 125, PageID # 3427.

superior's knowledge of his subordinate's proclivities is a central datum in determining whether the former ought to be liable (or immune from suit) for the latter's unconstitutional acts."); see Diaz v. Martinez, 112 F.3d 1, 4-5 (1st Cir. 1997) (affirming district court's denial of summary judgment where assistant superintendent of police force "fail[ed] to identify and take remedial action concerning an officer with demonstrably dangerous predilections and a checkered history of grave disciplinary problems"); Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (stating that documented widespread abuses put supervisors on notice that they may be liable for subordinate's future misconduct).

Likewise, even when the record is viewed in the light most favorable to Plaintiff, there is no trialworthy evidence that any "deficiency in training actually caused" York County's indifference to Plaintiff's federally protected rights.  Harris, 489 U.S. at 390.  In this case, Plaintiff cannot establish municipal liability by "showing merely that additional training would have been helpful in making difficult decisions."  See Connick, 563 U.S. at 68; Harris, 489 U.S. at 390 (explaining that it is insufficient to simply prove "[t]hat a particular officer [was] unsatisfactorily trained" or "that an injury or accident could have been avoided if an officer had better or more training").  The fact that officers such as Daigneault may not have "always follow[ed]" York County's taser and use-of-force policies and trainings, or that "better policies" and system checklists "might have diminished [the] risks" of excessive uses of force, is insufficient to find York County "deliberately indifferent" to the deprivation of Plaintiff's constitutional rights. Manarite By & Through Manarite v. City of Springfield, 957 F.2d 953, 957 (1st Cir. 1992) (finding no liability for inmate suicide although a better and more up-to-date screening procedure might have identified him as a risk requiring special procedures); Molton v. Cleveland, 839 F.2d 240, 246-47 (6th Cir. 1988) (finding only negligence for detainee's suicide where, after eight suicides

in a decade, city adopted suicide prevention policies but still gave officers little suicide-prevention training).[35]   Additionally, the fact that Daigneault may have been "unsatisfactorily trained" does "not alone suffice to fasten liability on the [County], for [his] shortcomings may have resulted from factors other than a faulty training program." Harris, 489 U.S. at 390-91; see Manarite, 957 F.2d at 959.  Put simply, there is no basis here for finding Plaintiff's injuries were closely related to York County's training of its correctional officers.  See Harris, 489 U.S. at 390.

The Court also concludes that this case does not fall within the "narrow range of circumstances" justifying a finding of deliberate indifference absent a pattern of violations. Brown, 520 U.S. at 409.  Here, "the need for more or different training" was not "so obvious" that York County "can reasonably be said to have been deliberately indifferent to the need."  Harris, 489 U.S. at 390.  As discussed previously, there was no "particular glaring omission in [York County's] training regimen" regarding the continuous or drive-stun use of tasers against an inmate. Brown, 520 U.S. at 410.  The Court acknowledges that "[a] lack of scrutiny" as to corrections officers' annual recertifications "may increase the likelihood that" those officers may miss some relevant and important training and that they would "act improperly" "when placed in a particular position to affect the rights of citizens." Id.  However, "that is only a generalized showing of risk," and "[t]he fact that inadequate scrutiny" of an officer's completion of his annual recertification "would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize the [training] record of a particular [officer] produced a specific constitutional violation." Id.  Even if York County's training regarding the use of force and tasers specifically was "less than adequate," the Court is "not persuaded that a plainly obvious

---

[35] Similarly, it is insufficient "to prove that [Plaintiff's] injur[ies] could have been avoided" if Daigneault "had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." Harris, 489 U.S. at 391.

consequence of [the] deficient training program" would be the violation of an inmate's constitutional right to be free from excessive force.  Barney, 143 F.3d at 1308.

In sum, the Court finds that Plaintiff has not "present[ed] competent evidence that shows a genuine issue for trial" with respect to Count Two.  Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 496-97 (1st Cir. 2011) (explaining that, while deliberate indifference is usually a jury question, "a party against whom summary judgment is sought is [not] entitled to a trial simply because he has asserted a cause of action to which [deliberate indifference] is a material element" (citation omitted)).  Thus, York County is entitled to summary judgment on Count Two.

### B.   Count Three: Failure to Intervene (Defendant Cram)

In Count Three of the Complaint, Plaintiff alleges that Defendant Cram is liable under 42 U.S.C. § 1983 and the MCRA for failing to intervene with Daigneault's alleged use of excessive force against Plaintiff.  (Compl., PageID # 15.)

"In assessing a claim of excessive force, courts ask 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'"  Lombardo v. City of St. Louis, Missouri, 141 S. Ct. 2239, 2241 (2021) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).  This standard "requires careful attention to the facts and circumstances of each particular case."  Id. (cleaned up).  "Those circumstances include 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'"  Id. (quoting Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)).  "The use of expert testimony is permissible in assisting the jury in evaluating claims of excessive force."  Parker v. Gerrish, 547 F.3d 1, 9 (1st Cir. 2008) (citing Jennings v. Jones, 499 F.3d 2, 15 (1st Cir. 2007)).

"An officer may be held liable . . . for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers." Miranda-Rivera, 813 F.3d at 73 (quoting Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002)); see Davis v. Rennie, 264 F.3d 86, 98 (1st Cir. 2001) ("An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance." (quoting Gaudreault v. Salem, 923 F.2d 203 (1st Cir. 1990) (per curiam))).  More specifically, the non-participating officer may be held liable for his nonfeasance "if he 1) was present when excessive force was used, 2) observed the use of excessive force, 3) was in a position to realistically prevent that force and 4) had sufficient time to do so." Walker v. Jackson, 56 F. Supp. 3d 89, 96 (D. Mass. 2014); see Davis, 264 F.3d at 102; see also Calvi v. Knox Cnty., 470 F.3d 422, 428 n.3 (1st Cir. 2006) ("[A] bystander-officer who has a realistic opportunity to prevent the use of excessive force by a fellow officer may in certain circumstances be held liable for a failure to intervene.").[36]  Additionally, there must be "evidence of participation, concerted action, or at least culpable knowledge" on the part of the non-participating officer.  Calvi, 470 F.3d at 429.

Here, Plaintiff alleges that Cram was present when Daigneault used excessive force against Plaintiff by repeatedly tasering him and ordering that he be pinned to the ground; "had a reasonable

---

[36] Cram, relying on caselaw from other district and circuit courts, asserts that the officer must have "reasonably understood that the plaintiff's constitutional rights were being violated by [the] other officer." Cram Reply, PageID #s 3433-34; see Cram Mot. (ECF No. 106), PageID #s 3114-15.  Although the First Circuit has never required this knowledge element, Cram points to one district court in the Circuit that has. See Simone v. Monaco, No. 20-CV-336-SM, 2022 WL 88196, at *10 (D.N.H. Jan. 6, 2022).  The Court reiterates, however, that the First Circuit has held that there must be "evidence of participation, concerted action, or at least culpable knowledge" on the part of the non-participating officer.  Calvi, 470 F.3d at 429. First Circuit law, which is binding on the Court, therefore does not require knowledge in every instance of an alleged failure to intervene.  See Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004) ("Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority").  Rather, "evidence of participation" or "concerted action" also suffices.

opportunity to intervene by taking action to stop Daigneault from [t]asering [Plaintiff] repeatedly or by refusing his order to pin [Plaintiff] to the ground"; and "acquiesced and participated by restraining [Plaintiff] for almost a minute while Daigneault raked the [t]aser across his chest." (Compl., PageID # 15.)  Cram moves for summary judgment on Count Three on the basis that, in light of Plaintiff's "aggressive demeanor" and "resistance" on the night of the arrest, as well as Cram's lack of any taser training, he "had no reason to think that [Daigneault']s use of the taser was not justified."  (Cram Mot. (ECF No. 106), PageID # 3117.)  He also asserts that he is protected from liability in this case by qualified immunity under section 1983 and that the record does not support Plaintiff's requested award of punitive damages against Cram.  (Id., PageID #s 3118-22.)

Because Plaintiff asserts that he was deprived of his right to be "protected from the use of excessive force" under "the Fourth and Fourteenth Amendment[s]" (Compl., PageID # 8), an "objective reasonableness" standard applies to this claim, see Miranda-Rivera, 813 F.3d at 70-71. As such, Daigneault's use of force against Plaintiff would not rise to the level of a constitutional deprivation if the force used was objectively reasonable in light of the facts and circumstances before him.  See Miranda-Rivera, 813 F.3d at 70-71; Graham, 490 U.S. at 397.  On the record presented, there is a genuine dispute as to whether Plaintiff was aggressive and resisting the officers leading up to Daigneault's use of force against Plaintiff.  (See, e.g., ECF No. 119, PageID #s 3351-52.)  If Plaintiff was in fact doing so, it would be reasonable to expect that he may have sustained some injuries as a result of the officers' attempts to restrain him and secure his compliance.  See Miranda-Rivera, 813 F.3d at 71.[37]  However, the question is whether Daigneault ultimately "used an unreasonable level of force on him."  Id.

---

[37] The Court may consider the events that have led up to the use of force.  See Young v. City of Providence, 404 F.3d 4, 22 (1st Cir. 2005); St. Hilaire v. City of Laconia, 71 F.3d 20, 26 (1st Cir. 1995).

Evidence of excessive force in this case includes: (1) photos that purportedly show the bruises and extensive taser burn marks on Plaintiff's body (see Lichten Dep. Ex. 1 (ECF No. 93-1), PageID # 1442; Lichten Dep., PageID #s 1070-72, 1138-39); (2) Plaintiff's testimony that he was "just standing in the middle of [his locked] cell" with his back turned when Daigneault came into the cell, that Daigneault knelt on his chest and tased him for a minute, that Daigneault did not warn Plaintiff that he would be tased, and that Plaintiff defecated himself and suffered four broken ribs as a result of the incident (Dunnigan Dep., PageID #s 1030, 1041-42, 1048-49);[38] (3) Plaintiff, having earlier completed the Jail's intake process, was unarmed at the time (Daigneault Dep., PageID #s 2574, 2616; Cram Dep., PageID # 2771); and (4) the testimony of Plaintiff's expert witness, Lichten, that Daigneault's taser use against Plaintiff violated York County use-of-force and taser policies (ECF No. 121, PageID # 3394).  See Miranda-Rivera, 813 F.3d at 71.  Viewing this evidence, along with the entire factual record in the light most favorable to Plaintiff, the Court finds that a factfinder could reasonably conclude that Daigneault used excessive force against Plaintiff.  See Gray v. Cummings, 917 F.3d 1, 9 (1st Cir. 2019) (finding "sufficient evidence to make out a jury question as to whether [officer] used excessive force" by tasering plaintiff because there was evidence that plaintiff had committed "at most a minor crime," was unarmed, walked toward the officer and pushed against his arm, and refused to put her hands behind her back); Parker, 547 F.3d at 9 (concluding that record supported jury's conclusion that officer's taser use was unreasonable where plaintiff had "earlier harassed or resisted the officers" but had not made any "'dramatic' threatening move" or engaged "in a serious offense which itself would justify the use of force"); Dastinot v. Watkins, No. 2:18-CV-00166-JCN, 2023 WL 121221, at *5 (D. Me.

---

[38] Other than Plaintiff's assertion that he was tased for a minute and had his back to the door when Daigneault came into the cell, the parties do not dispute this testimony.  See ECF No. 121, PageID #s 3379-80; see also ECF No. 125, PageID # 3429.

Jan. 6, 2023) (concluding that record supported excessive force claim in part because "reasonable jury could have concluded that although he had resisted before going to the ground, Plaintiff remained on the ground because his most recent movement was the result of his tensing or flinching in response to the pain from the use of the taser"). This genuine dispute of material fact precludes summary judgment on Count Three.

The record also reveals a genuine dispute as to whether Cram "did not tell [Daigneault] to stop using the taser because the altercation occurred so quickly." (ECF No. 119, PageID # 3354.) Thus, even assuming Daigneault's use of force was found to be excessive, the Court readily acknowledges that a reasonable jury weighing all of the evidence could arrive at opposite conclusions as to whether Cram "was in a position to realistically prevent that force . . . and had sufficient time to do so." Walker, 56 F. Supp. 3d at 96 (D. Mass. 2014); see Miranda-Rivera, 813 F.3d at 73 (concluding that there was "a genuine issue of material fact as to whether" two officers used excessive force against an arrestee and therefore "also a genuine issue of material fact as to whether [a non-participating officer]—who admittedly watched [the two officers] use force to get [the arrestee] inside the prison cell—failed to intervene").[39]

The Court also concludes that Cram is not entitled to qualified immunity at the summary judgment phase. See Miranda-Rivera, 813 F.3d at 73. "Determining whether a defendant is entitled to qualified immunity involves two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. at 72 (cleaned up). As previously discussed, there is sufficient evidence for a reasonable jury to conclude that

---

[39] Furthermore, at a more basic level, there is conflicting evidence in the record as to whether Daigneault's taser use on Plaintiff violated York County's policies and training. See, e.g., Chauvette Dep., PageID # 2476; ECF No. 93, PageID # 1231.

Daigneault's use of force under the particular circumstances violated Plaintiff's constitutional rights.  See id. at 73.  Accordingly, a jury reaching that conclusion could also conclude that a reasonable officer in Cram's position should have known that Daigneault's conduct violated Plaintiff's constitutional rights and therefore that Cram had a duty to intervene in such use of force.  "Because there is sufficient evidence to survive summary judgment," Cram is "not entitled to qualified immunity on the ground of insufficient evidence of a constitutional violation."  Id. at 75; see Belskis v. Somerset Cnty., No. 1:15-CV-00091-JAW, 2017 WL 4381675, at *18 (D. Me. Sept. 29, 2017) ("[B]ecause there is a genuine issue of material fact as to the deliberate indifference of the actors in this case, there is also a genuine issue of material fact as to the availability of qualified immunity.").  Nor is he "entitled to qualified immunity based on the 'clearly established' prong either because the law on" an officer's failure to intervene in a fellow officer's excessive use of force "has long been clear in the First Circuit."  Miranda-Rivera, 813 F.3d at 75.  However, "[d]epending on what Defendants can prove at trial, [Cram] may indeed be entitled to raise qualified immunity as an affirmative defense."  Penn v. Escorsio, 764 F.3d 102, 113-14 (1st Cir. 2014); see Ortiz v. Jordan, 562 U.S. 180, 131 (2011) ("A qualified immunity defense . . . does not vanish when a district court declines to rule on the plea summarily.  The plea remains available to the defending officials at trial . . . .").

Likewise, on the record presented, the Court declines Defendant Cram's invitation to conclude that punitive damages are foreclosed as a matter of law.  "Punitive damages may be awarded under 42 U.S.C. § 1983 only where 'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"  Powell v. Alexander, 391 F.3d 1, 15 (1st Cir. 2004) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  Defendant Cram's conduct in this incident included unlocking

the door of Dunnigan's cell for Daigneault and then restraining Dunnigan while he was being tased. Plaintiff points to Cram's subsequent testimony regarding this incident and suggests that a factfinder weighing the credibility of this testimony could conclude the testimony was "an attempt to cover up his own constitutional, tortious conduct."[40] (Pl. Response to Cram Mot. (ECF No. 118), PageID # 3347 (citing Davis v. Rennie, 264 F.3d 86, 115-16 (1st Cir. 2001)). Given the Court's assessment that punitive damages necessarily involves a credibility determination, the Court finds summary judgment on this issue would be inappropriate.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants York County and William King's Motion for Summary Judgment (ECF No. 104) and DENIES Defendant Donovan Cram's Motion for Summary Judgment (ECF No. 106).

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 13th day of March, 2023.

---

[40] See, e.g., Cram Dep. (ECF No. 98), PageID #s 2743-44 (testifying that Dunnigan had exited his cell and "tried to punch Daigneault in the face").